# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

OAKLAND TACTICAL SUPPLY, LLC,  )
JASON RAINES, MATTHEW REMENAR,  )
SCOTT FRESH, RONALD PENROD, AND  )
EDWARD GEORGE DIMITROFF,  )
                  )
        Plaintiffs,  )
                  )Case No. 18-cv-13443-BAF-DRG
        v.  )Honorable Bernard A. Friedman
                  )
HOWELL TOWNSHIP,  )
a Michigan general law township,  )
                  )
        Defendant.  )
_____/

Roger L. Myers (P49186)
MYERS & MYERS, PLLC
Attorneys for Plaintiffs
915 N. Michigan Avenue, Suite 200
Howell, Michigan 48843
(517) 540-1700
rmyers@myers2law.com


Martha A. Dean, (admitted 12/06/18)
LAW OFFICES OF MARTHA A. DEAN, LLC
Attorneys for Plaintiffs
144 Reverknolls
Avon, CT 06001
mdean@mdeanlaw.com

_____/

# PLAINTIFFS' OPPOSITION TO DEFENDANT'S RULE 12(C)
# MOTION FOR JUDGMENT ON THE PLEADINGS
# (SUPPLEMENTAL BRIEF - POST-*BRUEN*)

## ISSUES BEFORE THE COURT

On August 5, 2022, the Court of Appeals vacated this Court's September 10, 2020 order granting judgment on the pleadings and the Court's February 9, 2021 order denying reconsideration and remanded the case to this Court for further proceedings consistent with *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). On August 31, 2022, this Court ordered the Township to file supplemental briefing on its pending 12(c) Motion for Judgment on the Pleadings addressing the following two issues: (1) "whether Oakland Tactical's proposed course of conduct is covered by the plain text of the Second Amendment"; and (2) "whether historical evidence–to be produced by the Township in the first instance–demonstrates that the [Howell Township Zoning] Ordinance's shooting regulations are consistent with the nation's historical tradition of firearm regulation." Order, ECF No. 96, PageID.2206.

On September 30, 2022, the Township filed its brief, in which it failed to brief any claimed historical tradition supporting its restrictions. The Township argues only that training with firearms falls outside the Second Amendment. In addition, the Township's brief interjects new facts, and claims that revisions made in the past few weeks to its zoning ordinance now allow outdoor shooting ranges in other areas of the Township though not in the AR zone where Plaintiff Oakland's property is located. The Township also asserts that it allows rifle practice anywhere in the Township on private property as an accessory use, while not allowing rifle-range/traditional long-range target

2

practice in a professional, commercial range setting. In addition, the Township's brief includes many erroneous, inappropriate and bare factual claims concerning the Plaintiffs' goals and intent and concerning firearms, such as the false claim that proficiency with rifles, shotguns, and other long guns can be accomplished without actual training with such firearms (for example, through "simulation").

Plaintiffs maintain that the conduct at issue here—training with firearms—is covered by the plain text of the Second Amendment. Under *Bruen*, it is the Township's burden to show that its limitations on training are consistent with the Nation's history of firearm regulation, but the Township has not even attempted to meet that burden. And it could not, since there is no historical tradition supporting the Township's restrictions. The Township should not be given another opportunity to brief history in support of its motion. It has forfeited the opportunity to do so, and it would be a futile endeavor.

The Township's arguments rely on its addition of new facts (amendments made to the zoning ordinance on September 27, 2022), the effect of which with regard to whether outdoor rifle-distance/traditional long-distance ranges are allowed, or still effectively prohibited, involves factual claims that are contested. Thus, it is appropriate for Defendant's 12(c) Motion for Judgment on the Pleadings to be converted under Rule 12(d) to a Rule 56 Motion for Summary Judgment and for Plaintiffs to be afforded the opportunity to supplement this brief and provide exhibits substantiating the practical effect of the recent changes to the zoning ordinance, and the continuing existence of a

ban on rifle range/traditional long-distance outdoor ranges within the Township.

Even if the Court declines to convert the Motion to a Rule 56 Motion, the 12(c) Motion should be denied as the September 27, 2022 amendments to the Ordinance do not moot this case. The 2022 amendments do not moot either the existing damages claims or the Plaintiffs' claims for prospective relief for the reasons briefed by Plaintiffs on appeal to the Sixth Circuit, following the Township's 2021 amendments to the Ordinance, when the appellate court requested supplemental briefing on the recent amendments. *See* Exhibit 1, Plaintiffs-Appellants' Supplemental Brief, dated November 22, 2021, Doc. 37.

## SUMMARY OF THE FACTS[1]

*Howell Township burdens the right to train with firearms*

Howell Township regulates approximately 20,000 acres of unincorporated land in Livingston County, Michigan, under the Howell Township Zoning Ordinance ("Ordinance"). Second Am. Compl. ¶ 37, ECF No. 44, PageID.1095–96 ("SAC"). This Ordinance specifies permitted uses in each enumerated zoning district and "prohibit[s] any use not specifically listed," *id.* ¶ 34, ECF No. 44, PageID.1095. Plaintiff Oakland

---

[1] The facts presented here are consistent with the operative pleading and were true at the time the case was filed/the complaint amended. Zoning changes made in response to this action do not avoid damages, even if they were to impact the availability of injunctive relief. Furthermore, the zoning ordinance continues to be an effective ban on rifle range/traditional long-distance outdoor ranges within the Township.

Tactical Supply, LLC, plans to use land in a former rock quarry in an Agricultural Residential District to build an outdoor rifle distance/traditional long-distance shooting range, along with shot gun and handgun shooting areas. *Id.* ¶ 6, ECF No. 44, PageID.1085–86. The Township, however, does not permit such ranges in *any* district, while it admits that it allows unrestricted shooting on private property as an accessory use throughout the Township.  Def. Supp. Br., ECF No. 97, PageID.2221.

The Ordinance might *appear* to permit such ranges, but each apparent opening vanishes under scrutiny. To start, the Ordinance classifies "rifle ranges" as "open air business uses," *id.* ¶ 35, ECF No. 44, PageID.1095[2]—but it does "not allow Open Air Business Uses, either by right or as a special use, in any zone in Howell Township," *id.* ¶ 36, ECF No. 44, PageID.1095. Second, the Ordinance permits certain recreational facilities in the Regional Service Commercial District and the Heavy Commercial District—but no *outdoor* recreational facilities. *See* Ordinance, art. X § 10.02(B), ECF

---

[2] The Township changed this in its September 2022 revisions to the Ordinance (although it did not eliminate its effective ban on outdoor rifle-distance/traditional long-range distance ranges); however, the pleadings control at this stage in the litigation, and will continue to control the Plaintiffs' damages claims to date in any event. Even assuming *arguendo* that recent changes to the Township's zoning ordinances did fully address the legal claims raised by Plaintiffs, a claim by Plaintiffs of even nominal damages is sufficient to sustain the redressability requirement of Article III. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021).  Plaintiffs claim significant damages for injuries sustained, which continue to increase. Moreover, Plaintiffs maintain that even with the Township's recent changes to its zoning ordinance the zoning ordinance continues to violate their Second Amendment rights and that they continue to sustain damages.

No. 61-2, PageID.1395; *id.* art. XII, § 12.05, ECF No. 61-2, PageID.1406.

Finally, the Ordinance allows "recreation and sports areas . . . completely enclosed with fences, walls, or berms," *id.* art. XI, § 11.03(b), ECF No. 61-2, PageID.1399—but only "in the Highway Service Commercial District ('HSC District') consisting of 7 parcels with a total area of less than 30 acres," SAC ¶ 38, ECF No. 44, PageID.1096, and only if, in the judgment of the Township, such a use does not "interfere with or interrupt the pattern of development of" enumerated, highway-service-focused uses, Ordinance, art. XI, § 11.03, ECF No. 61-2, PageID.1399 (conditioning use for recreation and sports areas on such non-interference and on requirements of Article XVI, "Special Uses"); *id.* art. XVI, § 16.02, ECF No. 61-2, PageID.1447 (requiring Township approval of "special uses"). "The HSC District is highly developed serving the principal uses [for such a district], with only a few acres of undeveloped land available and significantly less area than that required for a safe, rifle distance/traditional long-distance range." SAC ¶ 41, ECF No. 44, PageID.1097. The HSC District does not include a rifle range, or even a stand-alone recreational facility, among its principal permitted uses, *see id.* ¶ 40, ECF No. 44, PageID.1096, nor is it purposed for activities such as rifle ranges that might interfere with "servicing the needs of high traffic at the interchange areas of public roads and highway facilities," *see id.* ¶ 39, ECF No. 44, PageID.1096.

In short, the Ordinance would conceivably permit outdoor shooting ranges only in the HSC District, but the space and traffic-related restrictions that the Ordinance

lays on uses in that District effectively ban outdoor shooting ranges of *any kind*.

Howell Township's restrictions burden, among others, Jason Raines, Matthew Remenar, Scott Fresh, Ronald Penrod, and Edward George Dimitroff ("Training-Plaintiffs"), all of whom mean to engage in lawful shooting activities—including training with their firearms at rifle distance/traditional long-range target distances—within Howell Township. *Id.* ¶¶ 7–15, 60–64, ECF No. 44, PageID.1089–90, 1101–02. Each would train in Howell Township in the use of firearms for self-defense, proficiency for common defense, and for other lawful purposes, such as shooting competitions and hunting. *Id.* But they cannot do so, because: there is no public shooting range in Howell Township; indoor ranges in the neighboring City of Howell are unable to meet general demand and do not allow for rifle practice; and the outdoor public range nearest to Oakland's property is the Island Lake Shooting Range in Green Oak Township—thirty minutes' drive from Howell Township, with expensive fees and long waiting lines. *Id.* ¶¶ 7–15, ECF No. 44, PageID.1089–90. None of these options offers rifle shooting or if it is allowed (at the range 30 minutes away) it is not available beyond 100 yards at rifle-range/traditional long-distance target distances needed by Training-Plaintiffs for traditional rifle shooting and training distances. *Id.* ¶¶ 30–32, ECF No. 44, PageID.1094.

To accommodate Training-Plaintiffs and others of the 327,000 rifle target shooters and 638,000 hunters within a 100-mile radius of its proposed site, Oakland leased, with an option to purchase, a one mile long, 352-acre property, which is bounded

by large berms and high fencing from the past rock quarrying operations on the property, in Howell Township. *Id.* ¶¶ 5, 6, 28 ECF No. 44, PageID.1085, 1094. Oakland made "plans to build an extensive outdoor shooting range facility for both private and public use," and therefore to "provide a safe location for area residents to practice target shooting for self-defense and other lawful purposes, including but not limited to a traditional rifle long-distance (e.g. 1,000 yard) range for qualified shooters, along with general access rifle, shotgun and handgun ranges." *Id.* ¶¶ 5, 6, ECF No. 44, PageID.1085–86. These plans were halted by the Township's effective ban, however, when the zoning staff advised Oakland that it "could not apply for a permit for a rifle range located on Oakland's property because the Agricultural Residential District [in which the quarry property is located] does not allow open air business uses, shooting ranges, or rifle ranges." *Id.* ¶ 46, ECF No. 44, PageID.1098.

Zoning staff also stated that Oakland should apply for a text amendment to the Zoning Ordinance to allow shooting ranges in the AR Zoning District. *Id.* But after receiving Oakland's application—and its $1,000 application fee—the Township rejected the proposed amendment that it had recommended, keeping the effective ban on outdoor, long-distance shooting ranges in effect in the AR Zoning District and throughout the Township. *Id.* ¶¶ 48–54, ECF No. 44, 1099–1100. As of July 11, 2019, Oakland had incurred costs of approximately $130,000, and had lost revenue of approximately $1,820,000 due to the Township's ban, while Training-Plaintiffs continued to be blocked

8

from training with firearms that require outdoor rifle-distance/traditional long-range facilities. *See id.* ¶¶ 59–64, ECF No. 44, PageID.1101–02.

*The Township's recent changes to the zoning ordinance*

On September 27, 2022, Howell Township revised its zoning ordinance concerning shooting ranges. The Township dropped the extreme 1,600 ft setback requirements, lowered outdoor recreation areas to 2 acres, and decreased the allowable decibel level at the property boundary to 60DBs. Even with these changes, the Township has effectively limited shooting ranges to indoor (pistol) ranges by limiting even potential locations to less than 4% of the total land mass of this largely rural township. Both the old and the new zoning ordinances make building any outdoor range, including the proposed Oakland Tactical range on 352 berm-surrounded acres in the AR zone, impossible with the Township.

## ARGUMENT

*The plain text of the Second Amendment covers training with firearms*

The plain text of the Second Amendment covers training with firearms. The Amendment's operative clause establishes that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008) makes clear, this right encompasses an individual right for law-abiding citizens to use firearms for lawful purposes. It follows from this that law-abiding citizens must have the corresponding right to *train* with

9

firearms. After all, a personal right to use firearms "wouldn't mean much without the training and practice that makes it effective." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).

The Amendment's prefatory clause further confirms that its plain text covers training with firearms. That clause is explicit that the operative clause promotes the existence of a "well regulated Militia," which *Heller* held to mean "the body of the people, trained to arms," *Heller*, 554 U.S. at 597. A right cannot promote a people trained to arms, however, without protecting *training with arms*. Thus, the prefatory clause's text also establishes that the Second Amendment protects training with arms.

Unsurprisingly, then, courts have uniformly recognized that "the right … to keep and bear arms" necessarily includes the right to train with arms. Already in *Heller*, the Supreme Court adhered to the longstanding interpretation that, "[n]o doubt, a citizen who … practices in safe places the use of [an arm] exercises his individual right" under the Second Amendment. 554 U.S. at 619 (quoting B. Abbott, Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land 333 (1880)). *Accord Luis v. United States*, 578 U.S. 5, 26, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring in the judgment) (""[t]he right to keep and bear arms . . . implies a corresponding right . . . to acquire and maintain proficiency in their use.") (quotations and citations omitted). Accordingly, in *Ezell, 651 F.3d at 704*, the Seventh Circuit squarely held that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain

proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." The Third Circuit adopted the same holding in *Drummond v. Robinson Township*, 9 F.4th 217, 227 (2021), and no court has contradicted *Heller*, *Ezell*, or *Drummond*.

The Township argues that because "[t]he First House of Representatives considered adding 'trained' language to the Second Amendment but opted to not include it," training is not covered by the Second Amendment. Def. Supp. Br., ECF No. 97, PageID.2220. The Township also notes that Virginia's state constitution referred to "a well regulated Militia, composed of the body of the people, trained to Arms." *Id.* The Township's examples, however, undermine its case.

As *Heller* explained, a militia is only "well regulated" if it is trained, so the training language from Virginia's constitution and Gerry's proposal would have been redundant. In its plain text analysis, *Heller* declared that "the adjective 'well-regulated' implies nothing more than the imposition of proper discipline and *training*." 554 U.S. at 597 (emphasis added). Thus, the training language was omitted *not* because training was unprotected, but because training already was protected.

*Heller* confirmed this in its plain text analysis of "necessary to the security of a free State." "[T]he militia was thought to be 'necessary to the security of a free State,'" the Court explained, because "when the able-bodied men of a nation are *trained in arms* and organized, they are better able to resist tyranny." *Id.* at 597–98 (emphasis added).

11

During the debates over the United States Constitution, the assertion that an armed and trained populace was the best defense against a tyrannical government was undisputed and repeated by both Federalists and Anti-Federalists. Alexander Hamilton argued in Federalist 29 that a standing army was not a serious threat to American liberty because "that army can never be formidable to the liberties of the people, while there is a large body of citizens little if at all inferior to them in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow citizens." THE FEDERALIST NO. 29 (Alexander Hamilton). Many Federalists made similar arguments. *See, e.g.*, *Essay on Federal Sentiments*, PHILA. INDEP. GAZETTEER, Oct. 23, 1787, *reprinted in* 32 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 435 (John P. Kaminiski et al. eds., 2019) (a tyrannical government "could never prevail over an hundred thousand men armed and disciplined"); *The Republican: To the People*, CONN. COURANT, Jan. 7, 1788, *reprinted in* 3 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 529–30 (Merrill Jensen ed., 1978) ("[T]he people of this country have arms in their hands; they are not destitute of military knowledge," which "enables them to defend their rights and privileges against every invader."). The same is true for Anti-Federalists. George Mason, for example, argued that an untrained populace could not stand up to a tyrannical government: "When against a regular and disciplined army, yeomanry are the only defence—yeomanry unskilful and unarmed, what chance is there for preserving freedom?" 10 DOCUMENTARY HISTORY OF

THE RATIFICATION OF THE CONSTITUTION, at 1271. Federal Farmer warned about the perils of a general population too busy with their private affairs to maintain arms proficiency: "that the substantial men, having families and property, will generally be without arms, without knowing the use of them, and defenceless; whereas, to preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, especially when young, how to use them." Federal Farmer, *Letter XVIII*, Jan. 25, 1788, *reprinted in* 20 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1073 (John P. Kaminski et al. eds., 2004).

*The Second Amendment does not exclude training consistent with the capabilities of arms in common use from its protected conduct.*

The Township attempts to narrowly define the conduct at issue as operating "an outdoor 1,000-yard shooting range anywhere [Oakland Tactical] chooses within the Township." Doc. 97 at 7. But this is too narrow. If the Township contends that some *type* of training is outside the scope of the Second Amendment, it must support that contention with history. At the level of text, Plaintiffs' conduct clearly falls within the protected activity of training with firearms. *Cf. United States v. Price*, 2022 WL 6968457, at *3 (S.D.W.V. Oct. 12, 2022) (concluding that ban on possessing firearms with obliterated serial numbers implicates conduct protected by the Second Amendment because it bans possession of arms).

In any event, even if the conduct in question for purposes of the textual inquiry were training at outdoor and long-distance ranges, the answer would not change. As

*Heller* and *Bruen* establish, "the Second Amendment protects the possession and use of weapons that are ' "in common use at the time" ' " of regulation. *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627); *see also id.* at 2134. It follows that the Second Amendment protects training, not just with short-range firearms, but with *all* arms in common use, including rifles that have an effective range extending to 1,000 yards. As Judge Kethledge asked at oral argument before the Sixth Circuit, "Why wouldn't the natural boundary … for the protection [of training with arms] … be the effective range of commonly used weapons?" Oral arg. at 34:30-34:42.

At oral argument on appeal, the Township mustered in response that, under such an interpretation, the scope of protected training may increase as the effective range of commonly used technology increases. Oral arg. at 35:03-35:27. But as *Heller* held and *Bruen* reiterated, "the Second Amendment's historically fixed meaning applies to new circumstances." *Bruen*, 142 Ct. at 2132 (citing *Heller*, 554 U.S. at 582). Just as the text's "reference to 'arms' does not apply only to those arms in existence in the 18th century," *id.* (cleaned up), neither does the Second Amendment's protection of training apply only at the effective range of arms in existence in the 18th century. Instead, the Amendment covers training with firearms in common use to the extent of their capabilities, thereby ensuring that arms whose use is protected are safely and effectively used.

*The Township has not met and cannot meet its burden as there is no historical tradition of prohibiting training with firearms at their effective range*

Despite the Court's clear order directing the Township to produce historical evidence

14

demonstrating that the Ordinance is consistent with the nation's historical tradition, Order, ECF No. 96, PageID.2206, the Township has elected not to provide such evidence. Its assurance that it has "in excess of 70 pages of historical analogs"—that it declined to produce—does not help. Def. Supp. Br., ECF No. 97, PageID.2231. This supplemental briefing was to address "whether historical evidence–to be produced by the Township in the first instance–demonstrates that the Howell Township Zoning Ordinance's shooting regulations are consistent with the nation's historical tradition of firearm regulation." Order, ECF No. 96, PageID.2206. The Township failed to produce the historical evidence and thus failed to carry its burden under *Bruen*. 142 S. Ct. at 2126. As a result, the Motion should be denied.

Indeed, far from *justifying* the Township's regulation, the supplemental brief *undermines* it. One kind of regulation for which historical analogues might exist is a regulation that to some degree limits training in places where it would not be safe to train. *See Heller*, 554 U.S. at 619 (quoting B. Abbott, Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land 333 (1880)). But the Township explicitly states that it allows practice shooting "on private property throughout all of the Township's zoning districts." Doc. 97 at 18. Indeed, "[t]he Township also allows long gun or pistol training *on individual private property in the AR district* ...." *Id.* at 21 (emphasis added). And the Township mentions no restriction on the distance at which such training on private property may take place. By claiming

to allow the training that Oakland Tactical wishes to provide (and that the individual plaintiffs plan to engage in) *on the same parcel of land if done by a private owner in an uncontrolled manner*, the Township proactively abandons safety-focused historical training regulations as improper analogues for its restrictions. Nor, indeed, could the Township have found any other historical tradition of analogous regulation because no such tradition existed. *Bruen* makes clear that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. When this is the case, as it is here, *Bruen*'s test is "fairly straightforward." *Id.*

Firearms training and the public safety issues associated with it have existed since the 18th century. Target shooting and shooting competitions were among the most popular and important forms of entertainment, as they offered both a source of amusement and an opportunity to hone the skills necessary for colonial life. *See* M.L. BROWN, FIREARMS IN COLONIAL AMERICA 127 (1980) ("The popular shooting match" was not only a common "entertainment form," but also "practical from the standpoint of practice."). But there is no evidence that any colonial- or founding-era government addressed the public safety concerns by prohibiting long gun training altogether.

Describing his experiences in Virginia and Pennsylvania in the 1760s, 70s, and 80s, Joseph Doddridge emphasized the popularity of target shooting: "Shooting at marks was

a common diversion among the men, when their stock of ammunition would allow it." JOSEPH DODDRIDGE, NOTES ON THE SETTLEMENT AND INDIAN WARS OF THE WESTERN PARTS OF VIRGINIA AND PENNSYLVANIA FROM 1763 TO 1783 124 (John S. Ritenour & Wm. T. Lindsey eds., 1912). He also noted their tendency to shoot from long distances: "Their shooting was from a rest, and at a great distance." *Id.*

"Long-distance shooting contests were major events in rural communities." NICHOLAS JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY 239 (3d ed. 2021). To improve their chances, "[s]ome riflemen even purchased a long, narrow brass or iron tube about half an inch in diameter that could be screwed into the top of the barrel to function as a rudimentary 'telescopic' sight.'" ALEXANDER ROSE, AMERICAN RIFLE: A BIOGRAPHY 19 (2008). Indeed, "[n]owhere else was the cult of accuracy so rigorously worshiped as in colonial America." *Id.* at 18–19.

The freedom to shoot was used to lure indentured servants. For example, to encourage immigration to Maryland, George Alsop advertised that "every Servant has a Gun, Powder and Shot allowed him, to sport him withall on all Holidayes and leasurable times, if he be capable of using it, or willing to learn." GEORGE ALSOP, A CHARACTER OF THE PROVINCE OF MARYLAND 59 (Newton D. Mereness ed., 1902) (1666).

The historical accounts of America's Founders demonstrate how common training was, and how highly the Founders regarded it. President John Adams was especially

fond of target shooting: "I spent my time as idle Children do," Adams wrote in his autobiography, "and above all in shooting, to which Diversion I was addicted to a degree of Ardor which I know not that I ever felt for any other Business, Study or Amusement." 3 Diary and Autobiography of John Adams 257 (Lyman H. Butterfield ed., 1961).

Thomas Jefferson shot often, competed sometimes, and even placed bets on competitions. For example, Jefferson recorded in 1768 that he "Won shooting 1/6" (one sixpence), and in 1769 that he "Lost shooting" "2/6." 1 Jefferson's Memorandum Books, Accounts, with Legal Records and Miscellany, 1767–1826, at 81, 150 (2d series, James A. Bear, Jr. & Lucia C. Stanton eds., 1997). In 1785, Jefferson lauded the benefits of recreational shooting and recommended that his nephew prioritize it over other forms of entertainment:

> As to the species of exercise, I advise the gun. While this gives a moderate exercise to the body, it gives boldness, enterprize, and independance to the mind. Games played with the ball and others of that nature, are too violent for the body and stamp no character on the mind. Let your gun therefore be the constant companion of your walks.

Thomas Jefferson, Writings 816–17 (Merrill D. Peterson ed., 1984). Jefferson maintained this enthusiasm throughout his life. He presented James Madison's adoptive son with firearms in 1816, "in the hope they will afford you sport in your daily rides." Letter from Thomas Jefferson to John Payne Todd, Aug. 15, 1816, *in* 10 The Papers of Thomas Jefferson: Retirement Series 321 (J. Jefferson Looney ed., 2013).

Ira Allen was Vermont's most influential founder. "[F]ew if any state papers of

Vermont were issued" from 1776 to 1786 that he "did not prepare or assist in preparing." 1 JAMES BENJAMIN WILBUR, IRA ALLEN: FOUNDER OF VERMONT, 1751–1814, at 87 (1928). Ira and his also highly influential brother Ethan regularly engaged in shooting. Ira wrote of one of Ethan's shooting matches in 1772:

> Mr. Peck and my brother in the course of the evening had a high banter, and some bets laid for shooting at mark next morning. . . . In the gray of the morning, Mr. Peck and my brother were up and preparing their guns, &c., and soon began to fire. Some I heard, and others sleep prevented the notice of. They continued their sport till the sun was two hours high.

*Id.* at 28. In 1796, Ira Allen stated that in America, "[a]rms and military stores are free merchandise, so that any who have property and choose to sport with it, may turn their gardens into parks of artillery, and their houses into arsenals, without danger to Government." IRA ALLEN, PARTICULARS OF THE CAPTURE OF THE OLIVE BRANCH, LADEN WITH A CARGO OF ARMS 403 (1798).

America's sixth president, John Quincy Adams, shared his father's fondness for target shooting and wished to pass it onto his children. When James Madison sent him to St. Petersburg to serve as Minister to Russia in 1809, Adams, recognizing that training *enhances* safety, asked his brother Thomas to take his eldest child (age 9) target shooting on Thomas's shooting excursions:

> One of the things which I wish to have them taught . . . is the use and management of firearms. . . . The accidents which happen among children arose more frequently from their ignorance, than the misuse of weapons which they know to be dangerous. . . . I beg you occasionally from this time to take George out with you in your shooting excursions, teach him gradually the use of the musket, its construction, and the necessity of

prudence in handling it; let him also learn the use of pistols, and exercise him at firing at a mark.

3 WRITINGS OF JOHN QUINCY ADAMS 1801–1810, at 497 (Worthington Chauncey Ford ed., 1914).

The Township is misguided in claiming that "[t]he nation's historical accounts of shooting by residents are similar to the shooting that can occur in the Township on private property now" because some historical examples involve "shooting at 100 yards" and "shooting at 150 yards." Def. Supp. Br., ECF No. 97, PageID.2221. First, it has never been alleged that the Plaintiffs each have access to 150 yards of private property—in fact, they do not. Second, because the Second Amendment "covers modern instruments" including "those that were not in existence at the time of the founding," it must protect the right to train with those modern instruments at their effective range. *Bruen*, 142 S. Ct. at 2132. Third, even if "the Second Amendment's historically fixed meaning" did not "appl[y] to new circumstances" as *Bruen* stated, *id.*, American history is replete with critical long-distance shots over 150 yards, *see, e.g.*, W.H. Hunter, *The Pathfinders of Jefferson County, Ohio, in* 6 OHIO ARCHEOLOGICAL AND HISTORY PUBLICATIONS 222 n.35 (Fred J. Heer ed., 1900, Supp. 1980) ("it was almost certain death" for British soldiers during the Revolutionary War "to expose their heads within two hundred yards of the riflemen."); Letter from James Madison to William Bradford, June 19, 1775, *in* 1 THE PAPERS OF JAMES MADISON 153 (William T. Hutchinson et al.

eds., 1962) ("we have men that would very often hit such a mark 250 Yds."); JOHN G.W. DILLIN, THE KENTUCKY RIFLE 84 (PALLADIUM PRESS 1998) (1924) (quoting the *Pennsylvania Gazette*'s August 5, 1775 report on George Washington's riflemen explaining that "A party of these men at a late review on a quick advance, placed their balls in poles of 7 inches diameter, fixed for that purpose, at the distance of 250 yards."); *id.* at 84 (Pennsylvania Gazette on August 16, 1775 stating that "A [British] 21entury was killed at 250 yards distance."); *Extract of a Letter from Messrs. Bradford, of Philadelphia, to the Printer of a Public Paper, dated Philadelphia, July 8, 1775*, *in* LETTERS ON THE AMERICAN REVOLUTION 1774–1776, at 167 (Margaret Wheeler Willard ed., 1925) ("This province [Pennsylvania] has raised 1000 rifle-men, the worst of whom will put a ball into a man's head at a distance of 150 yards or 200 yards"); JAMES THACHER, A MILITARY JOURNAL DURING THE AMERICAN REVOLUTIONARY WAR, FROM 1775 TO 1783, DESCRIBING INTERESTING EVENTS AND TRANSACTIONS OF THIS PERIOD WITH NUMEROUS HISTORICAL FACTS AND ANECDOTES, FROM THE ORIGINAL MANUSCRIPT 38 (1823) (Army surgeon Dr. James Thacher stating that "These men [American riflemen] are remarkable for the accuracy of their aim; striking a mark with great certainty at two hundred yards distance."); Rufus L. Porter, *Porter's Fort*, COLO. SPRINGS GAZETTE TEL., Jan. 2, 1973, at 18 (during the 1778 Siege at Boonesborough, a Shawnee interpreter was shot from 600 yards away);

GEORGE HANGER, COLONEL GEORGE HANGER'S ADVICE TO ALL SPORTSMEN, FARMERS AND GAMEKEEPERS 122, 144, 210 (1814) (British sharpshooter describing an American rifleman killing his horse from 300 yards, explaining that one "undoubtedly would hit me" from 300 yards, and several "could hit a man at four hundred yards"); 1 CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY 81 (1910) (An American rifleman, "seeing some British on a scow at a distance of fully half a mile, found a good resting place on a hill and bombarded them until he potted the lot.");￼ *id.* at 86 (a turning point in the Revolutionary War occurred when Timothy Murphy killed British General Simon Fraser from 300 yards out); *Tales from the 1769 Vansant/Craven Burying Ground,* THE CRAVEN HALL NEWSLETTER, Mar. 2021, at 7, https://perma.cc/A5FE-RAWY (during the Revolutionary War, Pennsylvanian Jacobus Scout "shot an English soldier at 900 yards and killed him"). It is unreasonable to suggest that colonial- and founding-era Americans were sure shots at several hundreds of yards without having practiced from such distances with regularity.

Because firearms training—including long-distance shooting—has existed since the 18th century and the government has not provided any evidence of a "distinctly similar historical regulation" to its effective ban on long gun training, it has failed to carry its burden under *Bruen*. 142 S. Ct. at 2131.

Today, the Township admits that target shooting at any distance with any

firearm is an accessory use permitted as of right in the Agricultural Residential (AR) District in which Oakland desires to construct an outdoor shooting range. Def. Supp. Br., ECF No. 97, PageID.2221; Def. Obj. to MSJ, Ex. A, Montagno Aff. ¶ 21, ECF No. 97, PageID.1800; Ex. D, Daus Aff. ¶ 13, ECF No. 97, PageID.1830; and Ex. E, Coddington Aff. ¶ 11, ECF No. 97, PageID.1834. Therefore, the Township has concluded that target shooting is a compatible use in the AR District, but desires to restrict such use as the primary for-profit use of property. As the Third Circuit concluded in *Drummond*, 9 F.4th 217, there is no historical tradition of restricting commercial target shooting operations and training with certain types of firearms in common use in areas where target shooting is otherwise allowed. *Id.* at 227-28.   This is precisely the type of impermissible restriction that the Township's Ordinance imposes on Oakland.

Second, the Township makes the bare (and erroneous) claim that long gun training at 100 to 150 yards is sufficient for the exercise of Second Amendment Rights. However, this is incorrect as target shooting to distances of 1,000 yards was common historically, see above pp. 20-21, as it is today. For example, the long-existing Civilian Marksmanship Program (CMP) operates and sanctions firearms training and competition. *See,* "About the CMP," available at https://thecmp.org/about/. The CMP specifically sanctions multiple competitive matches with target distances well beyond 100 yards and up to 1000 yards,

including the CMP Long Range Match, the CMP F-Class Long Range Match, and the CMP AR Tactical Rifle Long Range Match. (CMP Highpower Rifle Competition Rules, 25th Edition – 2022, available at https://thecmp.org/wp-content/uploads/2021/04/2022HighpowerRifleRules.pdf?vers=011622, pp. 55-65). These CMP matches are operated under a federal charter, demonstrating that target shooting at distances between 100 yards and 1,000 yards are common uses of firearms protected by the Second Amendment.

*Facts outside the pleadings*

Defendant Township seeks to rely on new facts in its 12(c) Motion for Judgment on the Pleadings, referencing recent amendments or proposed recent amendments to its zoning ordinances. Def. Supp. Br. ECF No. 97, PageID.2212-13; Ex. A, Ordinance Amendment No. 285, ECF No. 97-2, PageID.2235-52; Ex. B, Minor Revisions to Ordinance No. 285, ECF No. 97-3, PageID.2253-70. Defendant Township has not provided any legal basis for allowing such facts outside the pleadings on its 12(c) Motion. Even assuming *arguendo* that recent changes to the Township's zoning ordinances fully address the legal claims raised by Plaintiffs (a claim that Plaintiffs contest), when a plaintiff claims even nominal damages this is sufficient to sustain the redressability requirement of Article III. *Uzuegbunam v. Preczewski*, __ U.S. __, 141 S. Ct. 792, 802 (2021). Here, Plaintiffs are claiming significant damages and injuries sustained under the prior versions of the Ordinance. SAC ¶¶ 72-74, ECF No. 44,

PageID.1103-03.  Moreover, Plaintiffs maintain that even with the Township's very recent further changes to its Zoning Ordinance the ordinance continues to violate both Oakland's and the individual Plaintiffs' Second Amendment rights and they continue to sustain damages and injuries. Ex. 2, Paige Aff. ¶¶ 36-37.  The effects, if any, of the actual and proposed changes to the Township's ordinances are more appropriate considerations in fashioning a remedy and in the context of any conversion of the pending 12(c) Motion into a Rule 56 motion rather than for deciding the Township's 12(c) Motion for Judgment on the Pleadings.

## CONCLUSION

Plaintiffs respectfully request that Defendant's Motion be denied.  In the alternative, Plaintiffs request that the Motion be converted to a Rule 56 motion, pursuant to Rule 12(d) and ask that the Court consider the documents attached to this brief or referenced herein and that it grant additional time to the parties to provide needed factual support to their arguments.

In the event that the Court elects, instead, to take judicial notice of the September 27, 2022 amendments to the Zoning Ordinance and does not convert the Motion to a Rule 56 motion, Plaintiffs maintain that the current record in the ongoing controversy between the Township and Plaintiffs demonstrates that the September 27, 2022 amendments do not cure the Township's significant and impermissible restrictions on Plaintiffs' Second Amendment rights Thus, regardless of the Township's September 27,

2022 amendments, the Township's 12(c) Motion should be denied.

Dated:  October 14, 2022

Respectfully submitted,

MYERS & MYERS, PLLC
Attorneys for Plaintiffs

By: /s/ Roger L. Myers
Roger L. Myers (P49186)
915 N. Michigan Avenue, Suite 200
Howell, MI 48843
(517) 540-1700
rmyers@myers2law.com

/s/ Martha A. Dean
Martha A. Dean, Esq. (Admitted 12/6/18)
**Law Offices of Martha A. Dean, LLC**
144 Reverknolls
Avon, CT 06001
Phone: 860-676-0033
Fax: 860-676-1112
mdean@mdeanlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2022, I electronically filed the foregoing *Plaintiffs' Opposition to Defendant's Rule 12(C) Motion For Judgment On The Pleadings (Supplemental - Post-Bruen)* with the Clerk of the Court using the ECF system.

By:    /s/ Roger L. Myers
       Roger L. Myers, Esq. (P49186)
       Myers & Myers, PLLC
       915 North Michigan Ave., Suite 200
       Howell, MI 48843
       Phone: 517-540-1700
       Fax: 517-540-1701
       rmyers@myers2law.com