# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

OAKLAND TACTICAL SUPPLY, LLC, )
JASON RAINES, MATTHEW REMENAR, )
SCOTT FRESH, RONALD PENROD, AND )
EDWARD GEORGE DIMITROFF, )
           )
        Plaintiffs, )
           )Case No. 18-cv-13443-BAF-DRG
      v. )Honorable Bernard A. Friedman
           )
HOWELL TOWNSHIP, )
a Michigan general law township, )
           )
        Defendant. )
_____/

Roger L. Myers (P49186)
MYERS & MYERS, PLLC
Attorneys for Plaintiffs
915 N. Michigan Avenue, Suite 200
Howell, Michigan 48843
(517) 540-1700
rmyers@myers2law.com

Martha A. Dean, (admitted 12/06/18)
LAW OFFICES OF MARTHA A. DEAN, LLC
Attorneys for Plaintiffs
144 Reverknolls
Avon, CT 06001
mdean@mdeanlaw.com

_____/

## PLAINTIFFS' RESPONSE TO *AMICI CURIAE* BRIEF OF MICHIGAN MUNICIPAL LEAGUE LEGAL DEFENSE FUND AND MICHIGAN TOWNSHIPS ASSOCIATION

# CONTENTS

CONTENTS ..................................................................................................i

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................2

    I.   The issue is whether the Second Amendment protects training, and if so, whether the Township's training restriction is historically justified.....................2

    II.   The Second Amendment's plain text protects the right to train with arms.....3

        A.   *Heller*'s plain text analysis established that training is covered. ...............3

        B.   State constitutions confirm that training is protected. .............................6

        C.   The ratification debates over the Constitution focused on the need for a populace trained in arms. ...................................................................7

    III.  Most colonial- and founding-era firearms regulations promoted, rather than restricted, training.................................................................9

        A.   Most historical laws on *Amici's* list promote training. ............................10

        B.   Historic laws that restrict shooting in certain areas do not justify the Township's sweeping prohibition against outdoor shooting ranges................11

CONCLUSION ......................................................................................16

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State*, 50 Tenn. 165, 178 (1871)............................................................4, 5

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......... 3, 4, 5, 6, 7, 8, 13, 14, 15

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) .......................................5

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...........................................5

*Illinois Association of Firearms Retailers v. City of Chicago*, 961 F. Supp.2d 928 (N.D. Ill. 2014) ........................................................................................................4

*Luis v. United States*, 578 U.S. 5 (2016)....................................................................4

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ........... 3, 9, 13, 16

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) ....................................4

## Other Authorities

1 RECORDS OF MASSACHUSETTS, 1628-1641 (Nathaniel B. Shurtleff ed., 1853) ....10

3 THE ACTS AND RESOLVES, PUBLIC AND PRIVATE, OF THE PROVINCE OF MASSACHUSETTS BAY 306 (1878)........................................................................15

Adams, John, A DEFENCE OF THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED STATES OF AMERICA, vol. 3 (1788)........................................................................9

DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 37 (John P. Kaminski et al. eds., 2020)..................................................................7, 8

Kopel, David B. & Greenlee, Joseph G.S., *The Second Amendment Rights of Young Adults*, 43 S. ILL.U. L.J. 495 (2019).............................................................5

Letter from Samuel Nasson to George Thatcher, July 9, 1789, *in* THE COMPLETE BILL OF RIGHTS (Neil H. Cogan ed., 2d. ed. 2015) ................................................8

MINUTES OF THE COMMON COUNCIL OF THE CITY OF NEW YORK 1675-1776, vol. 4 (1905)..................................................................................................................12

THE CHARTER GRANTED BY THEIR MAJESTIES KING WILLIAM AND QUEEN MARY, TO THE INHABITANTS OF THE PROVINCE OF THE MASSACHUSETTS BAY IN NEW-ENGLAND (1726) ................................................................. 12

The CHARTER, GRANTED BY HIS MAJESTY, KING CHARLES II, TO THE GOVERNOR AND COMPANY OF THE ENGLISH COLONY OF RHODE-ISLAND AND PROVIDENCE-PLANTATIONS, IN NEW ENGLAND, IN AMERICA (1744) ......................................... 12

THE CHARTERS AND GENERAL LAWS OF THE COLONY AND PROVINCE OF MASSACHUSETTS BAY (1814) ................................................................. 10

THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH (1836) ................................................................................ 10

THE FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA, vols. 5, 6, 7 (Francis Newton Thorpe ed., 1909) ................................................................. 6, 7

THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, vol. 5 (James T. Mitchell & Henry Flanders eds., 1898) ................................................. 12

## INTRODUCTION

Plaintiffs provide this response to the brief of *Amicus Curiae*, Michigan Municipal League and the Michigan Township Association ("*Amici*"), as permitted by the Court in its Order, dated November 22, 2022. Plaintiffs direct the Court's attention to the relevant facts of this case set forth in Plaintiffs' Post-*Bruen* Supplemental Opposition Brief, dated October 14, 2022 ("Supplemental Opposition Brief"). The Court should not follow *Amici's* attempt to constrain the text of the Second Amendment to an inappropriately narrow meaning. The Second Amendment must be analyzed as the Supreme Court has interpreted it, and when analyzed that way it is clear that it covers training with firearms. The Court should also disregard *Amici's* efforts to cast the historical firearms laws listed in their appendix as anything more than efforts to ensure that unsafe shooting does not occur in the most populated areas of the time. *Amici* fail in their attempt to use these laws to justify the broad and prohibitory ban at issue here. The Defendant Township's prohibitions against outdoor shooting ranges for training at distances at which common firearms are used are untethered to police powers, generally, and safety considerations, specifically. Furthermore, *Amici*'s reliance on select historical firearms laws that may have imposed patently unconstitutional bans on all discharge of firearms is clearly improper.

In short, *Amici* have completely missed the mark in their attempt to meet Defendant's own burden in this case. *Amici* have not provided any appropriate textual argument or historical analogues for prohibiting training in a case involving Plaintiffs practicing with their firearms on a property of more than 350-acres, with a professionally designed shooting range facility, where the vast property is surrounded by large berms and chain-link fencing and the property is located in a zoning district where the Township allows residents to train with firearms on their own residential properties as of right.

## ARGUMENT

I.     THE ISSUE IS WHETHER THE SECOND AMENDMENT PROTECTS TRAINING, AND IF SO, WHETHER THE TOWNSHIP'S TRAINING RESTRICTION IS HISTORICALLY JUSTIFIED.

The issue presented in this case is whether the Second Amendment protects the right to train with firearms, and if so, whether the Township's training restriction is consistent with America's founding era historical tradition of firearm regulation. *Amici*, unwilling to confront that issue, repeatedly distort Plaintiffs' position, mischaracterizing the issue as whether there is "a right to build a half-mile long outdoor commercial gun range and to solicit use by gun owners far and wide in every town in America." Amici Br. 15.

Plaintiffs do not contend that every town must accommodate a 1,000-yard range. In fact, as *Amici* acknowledge, Plaintiffs have actually argued the contrary

proposition, stating: "Perhaps this would be a different case if it involved a wholly urban jurisdiction that could not safely accommodate an outdoor shooting range. But that is not this case." Amici Br. 6 (quoting Plaintiffs' Sixth Circuit Reply Br. 13). *Amici* also claim falsely that Plaintiffs make the "categorical argument" that "if it is in fact a Second Amendment *right* to have an outdoor, 1,000-yard long (or more) shooting range, then every community would necessarily be subject to it." Amici Br. 6. Plaintiffs, instead, have argued that there is no historical tradition of barring shooting ranges in places that can safely accommodate them; yet, barring shooting ranges in safe places is exactly what the Township's regulation does.

II.   THE SECOND AMENDMENT'S PLAIN TEXT PROTECTS THE RIGHT TO TRAIN WITH ARMS.

   A.   *Heller*'s plain text analysis established that training is covered.

   The first question under *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) is whether the Second Amendment's plain text protects the right to train with arms[1]. *Amici* argue that training is not protected because "the conduct that Plaintiffs want to engage in isn't to possess and carry a firearm." Amici Br. 14. But such an overly wooden reading of the Second Amendment would sap it of all meaning and conflict with *District of Columbia v. Heller*, 554 U.S. 570 (2008). Once it is determined that the text of the Second Amendment protects an individual right to

---

[1]  The argument here provides further support for Plaintiffs' Supplemental Opposition Brief, pp. 9–13.

have and carry firearms for lawful purposes, as *Heller* confirmed, other rights necessarily follow. For example, acquiring a firearm is not possessing or carrying one, yet if acquiring a firearm is not protected conduct, the Second Amendment is a dead letter, since the government could then simply ban acquisition of guns. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire firearms."); *Illinois Association of Firearms Retailers v. City of Chicago*, 961 F. Supp.2d 928, 930 (N.D. Ill. 2014) ("This right must also include the right to acquire firearms."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them").

*Heller* employed precisely this type of implied rights reasoning. There were two laws at issue in the *Heller* case—one that barred possession of handguns, and one that required all guns to be kept in an inoperable state. The Court made short work of the law requiring that guns be kept in a state where they would not be readily usable. *Heller*, 554 U.S. at 630. Just as the Second Amendment right to keep and bear arms necessarily includes a right to keep those firearms in a state where they can be used, *id.*, it also necessarily includes the right to train with arms.

Laws that prevent training obviously infringe upon the Second Amendment. *See*, *Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring in judgment) (constitutional rights implicitly protect those closely related acts necessary to their

4

exercise); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (right to possess firearms includes training and practice); *Drummond v. Robinson Twp.*, 9 F.4th 217, 230 (3d Cir. 2021) (practicing with firearms is protected by the Second Amendment); *Andrews*, 50 Tenn. at 178 (right to possess firearms involves the right to practice their use).

The Second Amendment's prefatory clause also supports Plaintiffs' argument that the text encompasses a right to train with firearms, as the clause is used to "resolve an ambiguity in the text." *Heller*, 554 U.S. at 643. If there were an ambiguity as to the Second Amendment's protection of training, which there is not, *Heller*'s interpretation of the prefatory clause resolves that ambiguity in favor of a right to train. The prefatory clause states that the militia is "necessary to the security of a free State," because, as the Court explains, "when the able-bodied men of a nation are *trained in arms* and organized, they are better able to resist tyranny." *Id.* at 597–98 (emphasis added). The prefatory clause provides clear recognition of the importance of protecting training with firearms.

The most common laws ensuring citizens' proficiency with arms in the colonial- and founding-era were militia laws. The American colonies and early states enacted hundreds of militia laws that required virtually all able-bodied males to keep arms and train with them. *See* David Kopel & Joseph Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL.U. L.J. 495, 533–89 (2019) (covering the 13

original states and colonies, Vermont, and Plymouth Colony). These hundreds of laws reflect the universal understanding at the time of the Nation's founding, that training with firearms *enhances* public safety and security.

      B.     State constitutions confirm that training is protected.

For the foregoing reasons, the text of the Second Amendment, as interpreted by *Heller*, plainly and necessarily covers the right to train with firearms. To the extent any further analysis were necessary (and it is not), that analysis would confirm *Heller* on this point. *Heller* looked to state constitutions to confirm its interpretation of the plain text of the Second Amendment. 554 U.S. at 600–03. State constitutions adopted prior to the Amendment's ratification confirm that the Founders believed the people must be trained in the use of arms to form an effective militia. For example, Virginia's 1776 declaration of rights provided that "a well-regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State." 7 The Federal and State Constitutions Colonial Charters, and Other Organic Laws 3814 (Francis Thorpe ed., 1909). Pennsylvania's 1776 constitution provided that "[t]he freemen of this commonwealth and their sons shall be trained and armed for its defence under such regulations, restrictions, and exceptions as the general assembly shall by law direct." 5 *id.* at 3084. Vermont's 1777 constitution copied Pennsylvania's language, 6 *id.* at 3742, and its 1786 constitution included similar language, *id.* at 3758. Likewise, in

Vermont's 1793 constitution, adopted after the Second Amendment's ratification, Vermont ensured that "[t]he inhabitants of this State shall be trained and armed for its defence, under such regulations, restrictions, and exceptions, as Congress, agreeably to the Constitution of the United States, and the Legislature of this State, shall direct." *Id.* at 3768.

> C.   The ratification debates over the Constitution focused on the need for a populace trained in arms.

*Heller* considers the drafting and ratification history of the Second Amendment. *Heller*, 554 U.S. at 598–99. The need for a populace trained and proficient in the use of firearms is stated in the proposed declarations of rights, and, as *Heller* concludes is reflected in the language of the Second Amendment. As further support for Plaintiffs' prior arguments in the present case, for example, Virginia's proposed arms right for the United States Constitution provided "[t]hat the people have a right to keep and bear arms: that a well-regulated militia composed of the body of the people trained to arms, is the proper, natural and safe defence of a free State." 37 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 253 (John Kaminski et al. eds., 2020). North Carolina proposed the same language as Virginia. *Id.* at 266. New York's proposal used similar language, but it substituted "the body of the people trained to arms" with "the body of the People capable of bearing Arms." *Id.* at 257. Rhode Island copied New York's language. *Id.* at 273.

Another example is provided by the words of Elbridge Gerry of Massachusetts, the future Vice President under James Madison, who preferred the language "trained to arms" in some of the proposals because it would "furnish a greater certainty" that a competent militia would be maintained. *Id.* at 403. Yet an objective of each proposal was to ensure that the populace would be familiar with arms. The objective of maintaining proficiency with arms was also reflected in the Second Amendment's use of the phrase "well-regulated" which implies the imposition of discipline and training. *Heller*, 554 U.S. at 597. Antifederalist Samuel Nasson acknowledged the need for firearms proficiency when urging his Federalist congressman George Thatcher, representing Maine district of Massachusetts, to ratify the Second Amendment:

> you know to learn the Use of arms is all that can Save us from a forighn foe that may attempt to subdue us, for if we keep up the Use the-of arms and become well acquainted with them we Shall allway be able to look them in the face that arise up against us.

Letter from Samuel Nasson to George Thatcher, July 9, 1789, *in* THE COMPLETE BILL OF RIGHTS 296 (Neil Cogan ed., 2d. ed. 2015).

Just before the Second Amendment's ratification, John Adams explained why a trained populace is needed to secure America's freedom: "That the people be continually trained up in the exercise of arms . . . [so that] nothing could at any time be imposed upon the people but by their consent." 3 John Adams, A DEFENCE OF

THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED STATES OF AMERICA 471–72 (1788) (quoting Marchamont Nedham, THE RIGHT CONSTITUTION OF A COMMONWEALTH 89 (1656)). As a check against such tyranny, Adams pointed out, "Rome, and the territories about it, were trained up perpetually in arms." *Id.* at 472.

Because the Second Amendment's plain text covers training, the Township must justify its training restriction by carrying its burden to establish a historical tradition of its broad and over-reaching regulation. *Bruen*, 142 S. Ct. at 2130.

III. MOST COLONIAL- AND FOUNDING-ERA FIREARMS REGULATIONS PROMOTED, RATHER THAN RESTRICTED, TRAINING.

Once the Court determines that the Second Amendment's plain text covers training, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2130. The Township failed to meet its burden, and *Amici* have not and cannot meet it on behalf of Defendant.

*Amici's* attempt to rectify the Township's failure by attaching to their own brief a long list of historic laws that mention firearms. This list of laws, borrowed from a brief in an unrelated state court case in Pennsylvania, *Amici* reference without analysis. *Amici* fail to explain how even one of the laws relate to the Township's sweeping ban on outdoor shooting ranges. Instead, *Amici* leave to the Court the arduous task of analysis of the laws listed. But importantly, with or without

consideration of the laws appended to *Amici's* brief, the government's burden of making the required historical showing has not been met.

    A.    Most historical laws on *Amici's* list promote training.

Most colonial- and founding-era laws referencing training with firearms on *Amici*'s appended list do not restrict training and, instead, encourage it. For example, in 1629, the governor of Massachusetts Bay urged the people to "bee exercised in the use of armes" so the community "may bee the better able to resist both forraigne enemies & the natives." 1 RECORDS OF MASSACHUSETTS, 1628-1641, at 392 (Nathaniel Shurtleff ed., 1853). In 1645, Massachassutts Bay extended its general encouragement to train with arms to a requirement "that all youth within this jurisdiction, from ten years old to the age of sixteen years, shall be instructed . . . in the exercise of arms," because "the training up of youth to the art and practice of arms will be of great use in the country in divers respects." THE CHARTERS AND GENERAL LAWS OF THE COLONY AND PROVINCE OF MASSACHUSETTS BAY 734 (1814). Plymouth Colony, starting in 1656, required its men to bring their guns to church and be ready to practice with them after service. THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 102 (1836) (requiring men to bear arms to church "with powder and bullett to improve if occation shall require.")

B.   Historic laws that restrict shooting in certain areas do not justify the Township's sweeping prohibition against outdoor shooting ranges.

The Founding era restrictions in *Amici*'s list of laws that limited where shooting could occur aimed to prevent fires from gunpowder and prevent accidental injury from uncontrolled shooting in more densely populated areas. Such laws cannot provide the necessary historical precedent in this case as Plaintiff Oakland's range property is over 350 acres, over a mile long, half a mile wide, and surrounded by large berms and chain-link fencing. Pls' Suppl. Br. 7–8. *Amici* acknowledge the vastness of the property where Plaintiffs would train when they point out in the brief that Oakland's range property is large enough to be an entire village on its own. Amici Br. 3. Furthermore, the Township admits that outdoor shooting activities on the Oakland's Howell Township property are not being prohibited for safety reasons, as the Defendant Township bans training at a professionally designed shooting range on Oakland's expansive property while allowing residents to train with firearms as an accessory use as of right on their own residential land in the same AR zoning district. Pls' Suppl. Br. 5.

*Amici's* list of appended laws demonstrate that public safety is the common justification for founding-era restrictions on the use of firearms. For example, at least one colonial restriction cited was designed to prevent fires. In Pennsylvania, a 1750 law that was enacted "for preventing accidents which may happen by fire," required a license to "fire any gun or other fire-arm" within a "built and settled" town. 5 THE

11

STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 108–09 (Mitchell & Flanders eds., 1898). Another section of the same law allowed shooting matches to occur but forbade gambling on such matches. *Id.* at 109.

Most colonial restrictions cited by *Amici* were designed to prevent shooting into crowded public areas. For example, in 1713, a Massachusetts Bay forbade anyone without permission to "discharge or fire off any gun upon Boston Neck within ten rods of the road or highway." THE CHARTER GRANTED BY THEIR MAJESTIES KING WILLIAM AND QUEEN MARY, TO THE INHABITANTS OF THE PROVINCE OF THE MASSACHUSETTS BAY IN NEW-ENGLAND 227 (1726).

Two colonial-era laws cited by *Amici* restrict shooting in public locations and other areas frequented by pedestrians. New York City's 1731 "Law Against Firing Guns in the Street" fined anyone who would "fire and discharge any gun [or] pistol…in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk." 4 MINUTES OF THE COMMON COUNCIL OF THE CITY OF NEW YORK 1675-1776, at 105 (1905). Similarly, a 1731 law in Rhode Island forbade shooting in "the Streets or Lanes of any Town." The CHARTER, GRANTED BY HIS MAJESTY, KING CHARLES II, TO THE GOVERNOR AND COMPANY OF THE ENGLISH COLONY OF RHODE-ISLAND AND PROVIDENCE-PLANTATIONS, IN NEW ENGLAND, IN AMERICA 120 (1744). Laws restricting the use of firearms in areas where shooting poses safety hazards to the public within the

most populated areas of the colonial and founding eras do not and cannot justify the Township's sweeping prohibitions on outdoor shooting ranges regardless of their safety. Here, none of the Plaintiffs have alleged that they seek to engage in firearm practice in the street or in public spaces frequented by pedestrians. Plaintiffs do not seek to practice target shooting in "any street, lane or alley, or within any orchard, garden *or other inclosure*" of the type that may have been common in colonial times in New York City. Rather, Plaintiffs seek to train with their firearms in the type of safe environment for shooting that the colonial-era restrictions cited by *Amici* simply do not regulate.

*Amici's* appended list of historical laws also includes laws from the 1800's. But history from the 19th-century should not be given "more weight than it can rightly bear." *Bruen*, 142 S. Ct. at 2136. "[T]o the extent later history contradicts what the text says, the text controls." *Id.* at 2137. As *Bruen* points out, "[n]ot all history is created equal"—because "'[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,'" and thus founding era history is paramount. *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35) (emphasis in *Bruen*).

Many of the 1800's laws cited by *Amici,* however, are similar to the colonial- and founding-era laws discussed above, as they simply prevented shooting into crowded areas or areas frequented by pedestrians. *See, e.g.*, Appx. 3–4 (1824 Philadelphia,

Pennsylvania: "streets, lanes and alleys"); *id.* at 4 (1824 Schenectady, New York: "street, lane or alley, or in any yard, garden or other enclosure, or in any place which persons frequent to walk"); (1836 Brooklyn, New York: near "turnpike"); *id.* at 5 (1823 Portsmouth, New Hampshire: "within one mile of the courthouse"—i.e., "the compact part of the town"); (1817 New Orleans, Louisiana: "in any street, courtyard, lot, walk or public way"); (1821 Tennessee: "within the bounds of any town, or within two-hundred yards of any public road of the first or second class"); *id.* at 6 (1823 Columbia, South Carolina: "within the limits bounded by Henderson, Blossom, Lincoln and Upper streets"); *id.* at 8 (1832 Portland, Maine: "streets, wharves, lanes, alleys, or public squares, or in any yard or garden within the city"); *id.* at 10 (1851 Newport, Rhode Island: "in the compact part of the town"); *id.* at 12 (1870 Dover, New Hampshire: "within the compact part of any town"); *id.* at 14 (1894 Rutland, Vermont: "within the principle inhabited parts of the city").

More problematic for *Amici's* argument is the fact that it relies on patently unconstitutional laws, in certain instances, as their list of laws includes select outlier laws for support even though they are as they appear to create a flat ban on the discharge of firearms.[2] For example, a 1746 law in Massachusetts Bay forbade the "discharge [of] any gun or pistol, charged with shot or ball, in the town of Boston

---

[2] Of course, it is doubtful that these laws would have been applied against lawful self-defense. *See Heller*, 554 U.S. at 631.

(the islands thereto being excepted), or in any part of the harbour between the castle and said town." 3 THE ACTS AND RESOLVES, PUBLIC AND PRIVATE, OF THE PROVINCE OF MASSACHUSETTS BAY 306 (1878). Other outlier laws on *Amici's* list are from the 1800's and impose similar unconstitutional bans. *See, e.g.*, Appx. 7 (1845 New Haven, Connecticut); *id.* at 8 (1855 Chicago, Illinois); (1855 Jeffersonville, Indiana); *id.* at 9 (1856 Winchester, Virginia); (1856 Burlington, Iowa); *id.* at 10 (1858 St. Paul, Minnesota). Laws cannot possibly provide historical analogues for modern firearms regulations where they eliminate the very right to keep and bear arms protected by the Second Amendment.

In short, as *Heller* made clear more than a decade ago, America's relevant historical tradition confirms that the Second Amendment protects a right to train with arms wherever such training can be accomplished safely. *Heller*, 554 U.S. at 619. Here, the Township has no credible claim that allowing Plaintiffs to train on Oakland's vast range property would be unsafe, as the Township admits residents are allowed to train with firearms on their own properties in the very same zoning district. Pls' Suppl. Br. 5. The list of historical laws appended to *Amici*'s brief simply fails to provide support for Defendant's broad prohibition on firearms training in areas where training can be accomplished safely.

## CONCLUSION

*Amici's* brief attempts to provide the historical evidence that the Township failed to provide in its Post-*Bruen* Supplemental Rule 12(c) Brief. The Defendant Township gave assurance to the Court that if ordered (yet again) it would produce the required evidence and "would file supplemental briefing." ECF No. 97, PageID. 2230–33. While *Amici* have expressed their own view that providing the Township with multiple opportunities to meet its burden "makes perfect sense," Amicus Br. 19, Plaintiffs disagree. As in *Bruen*, where the District Court declined to give New York repeated opportunities to supplement the record, the Township should not be granted repeated opportunities to comply with court orders where fundamental rights are at stake.

In short, *Amici*'s arguments fail to defeat Plaintiffs' claimed right to train in places where this can be done safely. *Amici*'s textual analysis is clearly wrong, and both their brief's list of historical laws and description of Oakland's vast property as the size of a "village" provide strong support for Plaintiffs' claim that Defendant Township's broad outdoor shooting range prohibition is unconstitutional.

Dated: December 6, 2022

Respectfully submitted,

MYERS & MYERS, PLLC
Attorneys for Plaintiffs

16

By: /s/ Roger L. Myers
Roger L. Myers (P49186)
915 N. Michigan Avenue, Suite 200
Howell, MI 48843
(517) 540-1700
rmyers@myers2law.com

/s/ Martha A. Dean
Martha A. Dean, Esq. (Admitted 12/6/18)
**Law Offices of Martha A. Dean, LLC**
144 Reverknolls
Avon, CT 06001
Phone: 860-676-0033
Fax: 860-676-1112
mdean@mdeanlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2022, I electronically filed the foregoing ***Plaintiffs' Response to Amici Curiae Brief of Michigan Municipal League Legal Defense Fund and Michigan Townships Association*** with the Clerk of the Court using the ECF system.

By:   /s/ Roger L. Myers
Roger L. Myers, Esq. (P49186)
Myers & Myers, PLLC
915 North Michigan Ave., Suite 200
Howell, MI 48843
Phone: 517-540-1700
Fax: 517-540-1701
rmyers@myers2law.com

17